**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSSOCIATED WITH 857-294-9629 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | No. 1:24-mj-00092-LEW<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 857-294-9629, with an unknown subscriber (hereinafter "the 9629 number"), which has service provided by T-Mobile US, Inc. ("T-Mobile"), which has offices at 4 Sylvan Way, Parsippany, NJ. The 9629 number was activated in October of 2020. T-Mobile records show it is subscribed to "Dianes Soto" of Lawrence, Massachusetts. It is believed to be used by a female who has been identified as Dianet Soto Sanz, an associate of Alexis De Leon. The 9629 number is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008. I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal

1

Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21

U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

5.  The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.  The DEA, together with partner agencies, has been investigating a subject know as "Leon Leon" and "Leon" for utilizing a particular Facebook Account (described for purposes of this affidavit as the "Leon Leon Account") and also a T-Mobile cellular telephone assigned 917-963-3689 (the "3689 number"), in the distribution of illegal controlled substances in the Bangor region. Specifically, the DEA has developed information that a Boston resident named Alexis De Leon, together with multiple associates, is using the Leon Leon Account and the 3689 number to arrange for the distribution of drugs in eastern Maine. Leon and other individuals are making short trips from Boston to the Bangor region to distribute drugs and collect drug proceeds from Maine sub-distributors.

*Prior Authority*

7.  On February 2, 2024, the government applied for and received authority to collect pen register trap and trace ("PRTT") data as to the Leon Leon Account in

Docket No. 1:24-mc-0057-JCN.[1] On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-00031-JCN, to collect certain information about the Leon Leon Account from Meta.

8.      On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective location information as to the 3689 number from T-Mobile. That application and warrant are attached as Exhibit 1. The affidavit in Exhibit 1 explains the background of this investigation and the identification of both the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated herein for purposes of probable cause.

9.      The DEA began collecting location information on the 3689 number on February 15, 2024. The government also obtained authority in 1:24-mc-61-JCN to collect PRTT data as to the 3689 number.[2] On March 7, 2024, the DEA applied for and obtained authority to extend the period of collection as to prospective location information as to the 3689 number. *See* Docket No. 1:24-mj-00070-JCN. As a result, the DEA has continued to collect that information, and also certain PRTT information, from T-Mobile.

---

[1] That authority also extended to a second Facebook Account operated by Alexis De Leon (hereinafter the "Alexis De Leon Account"). That second account was in his name and the account identification photograph for that account was identified as a photograph of Alexis De Leon.

[2] On February 16, 2024, the DEA applied for and obtained an additional order in 24-mc-0080-JCN to collect PRTT data from WhatsApp, LLC, as to a WhatsApp account that shared the same phone number as the 3689 number. WhatsApp, LLC, provides a platform for voice and text messaging. Users commonly create an account phone number that is identical to their cell phone number and can utilize the platform from their cell phones, as an alternative to traditional voice or text calling.

*Leon DTO Trips to Maine on February 27th and March 2nd*

10. Based on my training and experience and the facts in this investigation, including information gained via the above legal process, I believe that Alexis De Leon and or individuals associated with his drug trafficking organization ("DTO") made trips to Maine on February 27, 2024, and March 2, 2024, for the purpose of supplying customers with controlled substances and or collecting proceeds from sales of controlled substances in Maine.

11. Initial phone location data received from T-Mobile as to the 3689 number indicated the 3689 number was generally staying in areas near Boston, Massachusetts. Due to the imprecision of the data provided by T-Mobile, a specific address where the 3689 number was most often located could not be identified. However, it appeared that the phone generally was in the Dorchester neighborhood of Boston.

12. On February 27, 2024, the location data showed the 3689 number traveled from Massachusetts into Maine. Surveillance teams were dispatched to locate a vehicle associated with the incoming location data as the phone approached the Bangor area. Due to the imprecision of the information provided by T-Mobile, agents were initially not able to definitively locate any specific vehicle that correlated with the "ping" data from T-Mobile. However, based on a combination of surveillance and the location data, I came to believe that a particular vehicle—a red Toyota Highlander bearing Massachusetts plate 2AYE65 —was traveling with the 3689 number. Specifically, after several hours of surveillance as the phone pings were in the Bangor area, that vehicle was identified. As that vehicle appeared to head south and depart the Bangor area in the direction of Massachusetts, the phone pings likewise moved south.

13.     I contacted Maine State Police Trooper Thomas Pappas and provided him with information about the vehicle and its suspected location and route. I requested that he stop the vehicle and attempt to identify its occupants. Trooper Pappas located the vehicle in a posted construction zone and clocked the vehicle as traveling over the posted speed limit for that construction zone. He initiated a traffic stop and issued a warning to the driver. In doing so, he photographed the following identification cards for the female driver and her two male passengers: (1) Driver: Massachusetts Limited Term Driver's License for Dianet Soto Sanz of Dorchester, Massachusetts; (2) Passenger 1: Expired United States Visa for Ramon Antonio De Leon; (3) Passenger 2: Dominican Republic identification card for Alexis Mariano De Leon. Trooper Pappas did not detect or observe any obvious contraband inside the vehicle but did observe the two male passengers had between them a very large plastic container purporting to be a container for protein powder. He did not otherwise conduct a drug-related investigation and allowed the vehicle to depart a short time after stopping it.

14.     Based upon my review of the photographs from Trooper Pappas, I confirmed that Alexis Mariano De Leon appeared to be the same individual in photographs on the Leon Leon Account and was identified as Alexis De Leon by the Boston Police Department, all as explained in Exhibit 1. Additionally, it appeared to be the same individual identified via photograph as "Leon" by multiple cooperators in this investigation, including CHS1. The pattern of travel for the 3689 number was consistent with what has been reported by multiple individuals during this investigation, i.e. that "Leon" travels to the Bangor area to distribute drugs and/or collect proceeds from sub-distributors.

15. On March 2, 2024, I observed the location data showed the 3689 number was again traveling from Massachusetts to Maine. Again, the data showed the number made a same-day round trip to the Bangor area, although the data was not precise enough to determine exact stops or locations of the vehicle.

16. On March 5, 2024, I interviewed Jane Doe 4[3] at the Penobscot County Jail in Bangor, Maine. On that date, Doe admitted to purchasing bulk quantities of fentanyl from Massachusetts-based drug traffickers who utilize the Leon Leon Account. Specifically, Doe stated she had purchased fentanyl on approximately five to six separate occasions from the Leon Leon Account over the past three to four months. Doe stated that on March 2, 2024, she coordinated the purchase of 300 grams of fentanyl from the Leon Leon Account. Doe stated she met with one Hispanic female and two Hispanic males at a specific restaurant in Bangor on that date and purchased approximately 300 grams of fentanyl for $3,000. Doe positively identified Ramon De Leon as one of the two males whom she purchased the 300 grams of fentanyl from on March 2, 2024.

*Identification of the 9629 Number as Involved in the Leon DTO*

17. In addition to Jane Doe 4 and Trooper Pappas, multiple other individuals have reported Alexis De Leon has been driven to Maine by a female driver. As explained in Exhibit 1, on January 23, 2024, John Doe 3 was arrested and found in possession of significant quantities of suspected fentanyl powder. John Doe 3 described "Leon" and

---

[3] Jane DOE 4 is currently incarcerated at the Penobscot County Jail on a State of Maine arrest warrant for Failure to Appear. She has prior a criminal history that includes convictions for Assault. She is purportedly providing information to law enforcement in exchange for consideration towards a pending Maine State charge of Violation of Conditions of Release.

the Leon Leon Account as the source of those drugs and further described making multiple prior purchases from the same individual over several months. Those purchases were corroborated via text messaging and Facebook messaging recovered from John Doe 3's phone. On January 26, 2024, John Doe 3 stated Leon was always driven to Maine by one of two Hispanic females. He stated that he had seen a "husky" Hispanic female who would drive a red Ford SUV, whereas the other female driver was "skinny." He further stated that Leon had occasionally sent a runner, instead of personally traveling to Maine.[4]

18. On March 11, 2024—after being charged via federal complaint with possession with intent to distribute controlled substances—John Doe 3 was interviewed in the presence of his attorney.[5] During this interview, he positively identified Dianet Soto Sanz by photograph as one of Leon's female drivers.

19. I noted that the ping and PRTT data received during this investigation appeared to corroborate John Doe 3's statement that Leon will not always personally travel to Maine but would sometimes instead send a "runner" and coordinate transactions without traveling. For example, on certain days, the Facebook and phone PRTT data would show large amounts of activity with multiple Maine residents, but the ping data would show Leon's 3689 number did not travel to Maine. It is common for individuals involved in drug trafficking to direct associates to physically travel with

---

[4] John Doe 1 had also explained in November of 2023 that he had frequently seen Leon transported by a female driver.

[5] This interview was conducted pursuant to proffer agreement with the U.S. Attorney's Office, which provided John Doe 3 with certain immunity protections for statements made.

controlled substances for delivery, in order to minimize their own exposure to law enforcement.

20.     On March 13, 2024, I interviewed Kevin Morse in the Penobscot County Jail in Bangor, Maine. Morse had been arrested on an unrelated Maine State arrest warrant for failure to appear in court. Morse was Mirandized and admitted to distributing bulk quantities of fentanyl in the Bangor, Maine area over the past year. He identified Alexis De Leon and the Leon Leon Account as his source of supply for fentanyl. He further admitted to receiving approximately 200 grams of fentanyl twice per week over the past approximate one-year period. He further stated that several other Bangor-area residents have been obtaining fentanyl via the Leon Leon Account.

21.     Morse explained he had most recently obtained drugs from the Leon Leon Account on March 9, 2024, at a location in the Bangor region. He explained that he communicated with the Leon Leon Account to arrange this transaction, but that another individual (not Alexis De Leon) showed up with the drugs. This statement was consistent with data received as to March 9, 2024: The "ping" data for the 3689 number did not travel to Maine on March 9, 2024; but the PRTT data from De Leon's phone and the Leon Leon Account showed significant activity that day with suspected Maine customers, including Morse.

22.     Morse further explained that when he received drugs on March 9, 2024, there was a female with the male who delivered the drugs and she had bright red, dyed,

9

hair. Trooper Pappas had noted to me that Dianet Soto Sanz had dyed red hair at the time of the February 27, 2024 traffic encounter.[6]

23. PRTT data collected pursuant to the above-described process shows the 3689 number had 103 contacts with the 9629 number on March 9, 2024.[7] The 9629 number was the top contact for the 3689 number on that date. Based on my training and experience, these contacts, together with the ping data and PRTT data as to Maine residents, are consistent with Leon giving instructions to the user of the 9629 number on March 9th.

24. Based on this high number of contacts, the DEA sought subscriber information from T-Mobile. T-Mobile indicated the 9629 number is assigned to "Dianes Soto" of an address in Lawrence, Massachusetts and was activated on October 29, 2020. I noted the similarity between this name and the name of the driver identified by John Doe 3 and Trooper Pappas as a driver for Leon.

---

[6] Morse was shown the Massachusetts Identification Card for Dianet Soto Sanz and did not identify her as the female he saw on March 9, 2024. However, the photograph on that card appears to be from 2020 and Soto Sanz has black hair in the picture, not dyed red.

[7] It appears the 9629 number had 2 voice calls with the 3689 number on March 9, 2024. The rest (101) of these contacts were via a WhatsApp account that shares the same number as the 9629 number. It is very common for cell phone users to create a WhatsApp account with their cell phone number, as an alternative platform for communications. However, based on my training and experience, together with the fact that the 9629 number placed multiple calls to Leon, I believe it is highly likely that the WhatsApp Account was accessed from the physical phone assigned the 9629 number on March 9, 2024. WhatsApp messaging is end-to-end encrypted, making it more difficult to intercept than traditional phone-to-phone direct text messaging, For that reason, individuals involved in unlawful activity will frequently use platforms like WhatsApp for text message communications, instead of text messaging directly from a phone.

25. Based on my training and experience, I believe that the individual utilizing the 9629 number is a member of the Leon DTO and that collecting the location information described in Attachment B will result in evidence of the Target Crimes.

## ADDITIONAL INFORMATION ABOUT WIRELESS CARRIERS

26. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

27. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the 9629 number, including by initiating a signal

to determine the location of that phone on the T-Mobile network or with such other reference points as may be reasonably available.

28.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the 9629 number. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

29.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

30.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the 9629 number would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and

flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

31. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile services, including by initiating a signal to determine the location of 9629 number on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

//
//
//
//
//
//

32. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the 9629 number outside of daytime hours.

Respectfully submitted,

*[signature]*

Nicholas Rich
Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Mar 25 2024

City and state: Bangor, Maine

*[Judge's signature]*

Lance Walker, Chief U.S. District Judge
Printed name and title

14